**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------X

MICHAEL ARNONE,

          Plaintiff,

  - against -

CA, INC., CA SEVERANCE PLAN, and
ANDREW GOODMAN, Plan Administrator
of the CA Severance Plan and Senior Vice
President of Human Resources of CA, Inc.,
in his official capacity,

        Defendants.

-------------------------------------------------------X

**OPINION AND ORDER**


**08 Civ. 4458 (SAS)**



**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

      Michael Arnone asserts that CA, Inc., his former employer; the CA

Severance Plan; and Andrew Goodman, plan administrator of the CA Severance

Plan and Senior Vice President of Human Resources of CA, Inc., each violated his

pension rights under the Employee Retirement Income Security Act ("ERISA").[1]

This lawsuit addresses the fiduciary duties that accompany a delegation of

administrative functions under ERISA, as well as the procedural protections

---

[1]    29 U.S.C. §§ 1001-1461.

afforded to a claimant under ERISA and Department of Labor ("DoL") regulations promulgated to facilitate compliance with the statute. Goodman claims $39,350.39 in unpaid benefits, along with compensatory damages, punitive damages, interest, attorney's fees, costs, and other relief as the Court deems proper.

On January 21, 2009, this Court issued a decision from the bench narrowing the issues for trial. Specifically, the Court ruled (1) that Arnone's sole private cause of action arises from 29 U.S.C. § 1132(a)(1)(b), although that provision could also be used as a vehicle to enforce other ERISA provisions; (2) that all three defendants were subject to suit; and (3) that ERISA's express remedies are exclusive, eliminating Arnone's claims for compensatory and punitive damages. The Court also provided some guidance concerning the standard of review to be applied at trial, although ongoing factual disputes prevented a final determination.

On January 27, 2009, this Court conducted a one-day bench trial. On the basis of the findings of fact and conclusions of law stated below, judgment is rendered in favor of Michael Arnone, in the amount of $46,693.34 against Goodman and the CA Severance Plan and in the amount of $10,000 against Goodman individually. Arnone is also awarded fees and costs, to be determined

2

based on further submissions.

## II.    FINDINGS OF FACT

### A.    The Parties

Arnone was employed by CA, Inc. from September 1994 until
December 5, 2006.[2]  In those twelve years, Arnone had a spotless employment
record and was considered a valuable and trusted employee.[3]  As of December
2006, Arnone worked in software development in the Enterprise Systems
Management group, where he was supervised by Darrin Solomon.[4]

CA, Inc. – formerly known as Computer Associates International, Inc.
– is a business software company with more than 13,000 employees.[5]  The CA
Severance Plan ("the Plan") is a benefits plan whose purpose "is to provide . . .
severance benefits to certain employees of [CA, Inc.] who lose their positions with
the Company involuntarily and only under certain circumstances."[6]  Andrew

---

[2]    *See* Joint Pretrial Order, Undisputed Facts ("UF") ¶ 1.

[3]    *See* Trial Transcript ("Tr.") at 45:1-45:5 (Buonaiuto); *id.* at 76:24-
77:25 (Solomon).

[4]    *See id.* at 13:14-15:18 (Arnone).

[5]    *See id.* at 15:3-15:9 (Arnone); *id.* at 96:20-96:23 (Goodman).

[6]    Severance Policy, Ex. 10, at 1.

Goodman is Executive Vice President of Human Resources for CA, Inc.[7]  He also

serves as plan administrator for the CA Severance Plan.[8]

## B.     The Severance Plan

The CA Severance Plan provides certain substantive and procedural

rights for employees after termination of employment at CA, Inc.[9]  An employee is

eligible for severance benefits if he or she is involuntarily terminated, unless

termination results from an enumerated exception, including dishonesty.[10]  An

employee who qualifies for full severance will receive a "Separation Payment"

equal to two weeks of his or her base salary for each full year of continuous

service at CA, along with a COBRA assistance payment.[11]  CA pays "benefits

under the Plan from its general assets to the extent available."[12]

The first sentence of the Plan documents states that severance

---

[7]      *See* UF ¶ 12; Tr. at 96:16-96:19 (Goodman).

[8]      *See* UF ¶ 12.

[9]      *See* Severance Policy at 1.

[10]     *See id.* at 2.

[11]     *Id.* at 2-3.

[12]     *Id.* at 4.

benefits are provided "within the sole discretion of the Plan Administrator."[13]  The Plan later establishes that the Plan Administrator has "the responsibility and the absolute discretionary authority to interpret the terms and provisions of the Plan, to determine eligibility for benefits under the Plan, and to determine the amount of such benefits."[14]  The Plan does not expressly establish whether the Administrator may delegate investigative or decision-making authority.[15]

Plan documents establish procedures for review of an initial determination, including written notification of the outcome of a claim.[16]  After a denial, an employee has a right to appeal, along with rights to review pertinent Plan documents and submit written argument in support of appeal.[17]  The Plan does not expressly provide an employee with a right to review documents or evidence relied upon by the Plan Administrator.[18]

---

[13]     *Id.* at 1.

[14]     *Id.* at 6.

[15]     *See id.  See also* Tr. at 105:12-107:10 (Goodman) (noting the absence of express authority to delegate).

[16]     *See* Severance Policy at 4.

[17]     *See id.* at 5.

[18]     *See id.*

## C.     The November 30, 2006 ATM Incident

At approximately 7 p.m. on the evening of November 30, 2006, Jason

Medina, a CA employee, attempted to use the ATM in the lobby of CA's

building[19]  Medina requested forty dollars from the ATM, but the machine did not

disburse the funds.[20]  He spent approximately ten minutes trying to work out the

problem,[21] including seeking assistance from building security.[22]  After security

informed him that he would have to take up the issue with Bethpage Federal

Credit Union – the operator of the ATM – he left the building.[23]

At approximately 7:30 p.m., Arnone entered the lobby of CA's

building.[24]  He crossed the turnstile and began to walk toward the only set of

functioning doors, which were on his right.[25]  After a few steps, he pivoted away

---

[19]     *See* UF ¶ 5; Call Center Request Detail, Ex. 5.

[20]     *See* Call Center Request Detail.

[21]     *See* Security Camera Video, Ex. 2.

[22]     *See* Call Center Request Detail.

[23]     *See id.*

[24]     *See* UF ¶ 3.

[25]     *See* Security Camera Video.  The doors directly in front of him were
blocked by cones.  *See id.*; Tr. at 149:20-149:25 (Arnone).

from the door and began walking toward the ATM.[26]  He reached his right hand

towards the cash slot, quickly withdrew it, then pivoted, walked to the functioning

doors, and left.[27]

       The security camera that captured the incident provides grainy

footage at a slow, choppy frame rate.[28]  As Arnone withdrew his hand from the

machine, no cash is seen.[29]  Moreover, Arnone crossed the lobby with his right

hand visible to the camera, and no cash is seen in his hand.[30]  If Arnone had taken

money from the ATM, he could have hidden it from the camera only by

transferring the bills to his left hand as he pivoted or by deftly palming them.

### D.    December 5, 2006 Termination

       On December 5, 2006, Paul Buoniauto – who was then a Vice

President of Relationship Management at CA – received a call from CA's Global

Safety Asset Protection Group alerting him of the November 30 incident.[31]

---

[26]    *See* Security Camera Video; Tr. at 153:2-153:5 (Arnone).

[27]    *See* Security Camera Video; Tr. at 153:9-153:19 (Arnone).  *See also* Photograph of ATM, Ex. 1 (indicating the location of the cash slot on the ATM).

[28]    *See* Security Camera Video.

[29]    *See id.*

[30]    *See id.*

[31]    *See* Tr. 30:25-31:7, 35:17-36:1 (Buonaiuto).

Buoniauto then retrieved an incident report.[32]  The report stated that shortly after

the ATM had failed to provide Medina with the money he requested, Arnone

entered the lobby, began walking toward the door, then "unexpecteedly . . .

return[ed] to the machine where it appeared he[] had removed something from the

cash tray."[33]

Based on that accusation, Buoniauto immediately called Darrin

Solomon and asked him to bring Arnone to the Human Resources department to

discuss the incident.[34]  First Buoniauto asked Arnone to explain "what had

happened" on November 30, but Arnone replied that he did not understand the

question.[35]  Buoniauto then told Arnone that a woman had attempted to use the

ATM on November 30th, that the machine had failed to disburse her money, and

that the bank had reported that the ATM was short funds for the day.[36]  He then

explained that security indicated that Arnone was the next person to approach the

---

[32]    *See id.* at 36:2-37:12 (Buonaiuto).

[33]    Call Center Request Detail.

[34]    *See* Tr. at 37:13-37:25 (Buonaiuto).

[35]    *See id.* at 39:12-39:23 (Buonaiuto).

[36]    *See id.* at 16:21-17:6 (Arnone).

ATM and asked him if he had taken money from the ATM.[37]

Arnone vehemently denied the accusation.[38]  On November 30,

Arnone had made a mortgage payment at Washington Mutual using a check from

an account at Chase.[39]  Before making his payment, Arnone had scheduled a fund

transfer from a savings account to his checking account in order to insure that the

check for his mortgage payment did not bounce.[40]  Arnone claimed that as he was

walking out of the lobby, he thought to check his bank balance on the ATM and

get a receipt stating that the scheduled transfer had been completed.[41]  However,

he stated that as he approached the ATM, he observed an error message

concerning the cash door, so he turned and left.[42]  He stated that he had reached

---

[37]     *See id.* at 17:6-11 (Arnone).

[38]     *See id.* at 40:12-41:5 (Buonaiuto).

[39]     *See id.* at 17:13-19:4 (Arnone); 11/30/06 Washington Mutual Receipt,
Ex. 16, at 1; 11/30/06 Chase Check No. 1010, Ex. 16, at 3.

[40]     *See* Tr. at 19:5-19:10 (Arnone); 11/30/06 Chase Transfer Schedule
Confirmation, Ex. 16, at 2.

[41]     *See* Tr. at 19:5-19:18, 20:3-20:12, 138:8-138:15 (Arnone); *id.* at
41:11-41:14 (Buonaiuto); *id.* at 81:6-81:8 (Solomon).  Given the substantial
documentary evidence supporting this assertion, as well as his demeanor on the
stand, I find Arnone's explanation credible.

[42]     *See id.* at 20:12-20:29 (Arnone); *id.* at 41:19-41:20 (Buonaiuto); *id.* at
81:8-81:20 (Solomon).  Given the ATM malfunction prior to Arnone entering the
lobby, the conspicuous lack of contrary evidence concerning the error message

toward the cash drawer to tap it and see if it would close.[43]  Buonaiuto told Arnone

that he had not yet personally reviewed the video, and Arnone stated that the video

would exonerate him.[44]

Buonaiuto then watched the surveillance video from November 30.[45]

On the basis of the video, he formed the opinion that Arnone had taken money

from the cash tray of the ATM and decided to terminate him.[46]  Buonaiuto then

showed the video to a co-worker, reviewed Arnone's personnel records, and spoke

with Joel Katz, an attorney for CA.[47]  Finally, Buonaiuto went to Goodman's

office, explained Arnone's story and what he had seen on the video, then informed

Goodman of his decision to terminate Arnone on the basis of theft and

dishonesty.[48]  At some point, Buonaiuto had also spoken to Solomon, who told

---

displayed on the screen (which CA could have learned by asking Medina), along
with Arnone's demeanor on the stand, I find it credible that the machine continued
to display an error message when Arnone approached it.

[43]     *See id.* at 41:14-41:20 (Buonaiuto).

[44]     *See id.* at 21:10-21:18 (Arnone); *id.* at 41:20-41:22 (Buonaiuto).

[45]     *See id.* at 42:2-42:8 (Buonaiuto).

[46]     *See id.* at 43:5-43:6, 60:17-60:20 (Buonaiuto).

[47]     *See id.* at 44:19-45:5, 47:7-10 (Buonaiuto).

[48]     *See id.* at 45:6-45:21 (Buonaiuto); *id.* at 102:9-23 (Goodman).

Buonaiuto that Arnone was a hard-working, dedicated employee.[49] He did not

speak to Medina or any security guards who might have personally observed the

incident.[50] Nor did he consider the staffing needs of Arnone's department when

making his decision.[51]

　　　　Approximately an hour after the first meeting between Arnone,

Buonaiuto, and Solomon, Buonaiuto asked Solomon to bring Arnone back to

Human Resources.[52] Buonaiuto again asked Arnone if he had taken the money,

and Arnone maintained his innocence.[53] Buonaiuto then showed Arnone the

---

[49]　　*See id.* at 24:18-24:22 (Arnone); *id.* at 90:21-91:23 (Solomon).
During his recitation of the chronology of his investigation, Buonaiuto failed to
mention this conversation. This conspicuous absence speaks against the general
credibility of Buonaiuto's testimony.

[50]　　*See id.* at 61:14-61:18 (Buonaiuto). Although Buonaiuto stated at
trial that he also called the Bethpage Federal Credit Union and that the
conversation "further solidified" his opinion, *id.* at 46:3-46:18 (Buonaiuto), I do
not find this testimony credible. Buonaiuto's notes describe all other aspects of
the investigation but make no reference to contacting Bethpage. *See* Buonaiuto
Notes, Ex. 4. Nor did Buonaiuto tell Goodman that he had called Bethpage when
he described the investigation. *See* Tr. at 127:5-128:5 (Goodman). Moreover,
Medina's account was not debited, *see* Medina Bank Statement, Ex. 3, and
Bethpage reported that it had no records of an ATM malfunction on November 30.
*See* 11/13/08 Bethpage Subpoena Response, Ex. 18. This documentary evidence
severely undermines the credibility of Buonaiuto's assertion.

[51]　　*See id.* at 79:3-79:5 (Goodman).

[52]　　*See id.* at 21:24-22:2 (Arnone); *id.* at 47:21-47:25 (Buonaiuto).

[53]　　*See id.* at 22:2-22:5 (Arnone); *id.* at 48:2-48:12 (Buonaiuto).

video, but Buonaiuto would neither let Arnone observe the individual who had

made the prior transaction nor tell him how much money was involved.[54]

Afterward, Buonaiuto informed Arnone that he was terminated effective

immediately and that any attempt to vindicate himself would be futile.[55]

Arnone was not awarded severance after his termination.[56] Had he

been awarded severance, he would have received a Separation Payment of

$33,852.96[57] and a $4,500 COBRA assistance payment.[58]

### E.    The February 2007 Severance Request

On February 26, 2007, Arnone – through counsel – filed a formal

claim for severance benefits pursuant to the Plan, along with requests for

---

[54]     *See id.* at 22:5-23:15, 24:4-24:9 (Arnone); *id.* at 48:7-21, 70:24-71:7 (Buonaiuto).

[55]     *See id.* at 23:22-23:25 (Arnone); 49:10-50:6, 71:8-71:12 (Buonaiuto).

[56]     *See id.* at 23:19-23:20 (Arnone); *id.* at 50:10-50:1 (Buonaituo).

[57]     Arnone's annual salary at the time of his termination was $73,600. *See id.* at 27:25:29:1 (Arnone). His weekly salary – found by dividing his annual salary by 365.25 and multiplying it by seven – was $1,410.54. Because Arnone had been at CA for over twelve years, his severance would have been twenty-four weeks of salary. This totals to $33,852.96.

[58]     *See id.* at 28:3-28.8 (Arnone). *See also* CA Severance Plan at 3 (providing $4,500 in COBRA Assistance to individuals with ten years or more of continuous service and prior spousal coverage).

information considered as a part of the severance determination.[59] The next day,

Goodman sent a letter directly to Arnone stating that the claim was denied because

"[t]he Plan does not provide benefits to employees whose employment termination

is the result of dishonestly, including theft."[60] The letter states that Goodman

personally "concluded that [Arnone] took money from an [ATM] located on CA

premises that did not belong to [him] and then provided dishonest and otherwise

evasive answers to CA representatives conducting an investigation into [his]

conduct related to the ATM incident."[61] The letter provides notice of appellate

rights and procedures but does not lay out what evidence Goodman relied upon in

rendering his decision.[62]

  While Goodman testified that he personally read the February 26th

letter – including Arnone's assertion that he would be willing to take a polygraph

---

[59] *See* 2/26/07 Letter from Harvey M. Stone, plaintiff's former attorney, to Goodman, Ex. 11. This request included copies of two previous letters sent by Stone to Buonaiuto and Katz concerning Arnone's termination. *See* Tr. at 118:15-118:20 (Goodman). *See also* 12/22/07 Letter from Stone to Buonaiuto, Ex. 7; 1/9/07 Letter from Stone to Joel Katz, defendants' attorney.

[60] 2/27/07 Letter from Goodman to Arnone, Ex. 12.

[61] *Id.*

[62] *See id.*

administered by an expert of CA's choosing[63] – he did not engage in any

independent review of the facts.  Rather, he delegated fact-finding to Buonaiuto

and solely relied on the short conversation between the two that had occurred

approximately three months earlier and the representation of CA counsel that no

new evidence had come to light since the decision to terminate for cause was made

on December 5.[64]  Although Goodman did see Arnone's request for information

concerning the event – including a copy of the video, the name of the individual

who had purportedly lost money, and the amount of money involved – he did not

address those requests.[65]  Rather, he delegating that request to CA attorneys, who

failed to respond.[66]  Like Buonaiuto, he did not consider the staffing needs of

Arnone's department when rendering his decision concerning severance.[67]

**F.    The March 2007 Severance Appeal**

On March 6, 2007, Arnone – again through counsel – filed an appeal

---

63      *See* Tr. at 112:17-112:19, 116:1-116:24 (Goodman).  *See also*
12/22/06 Letter from Stone to Buonaiuto at 3 (outlining the polygraph offer).

64      *See* Tr. at 104:8-104:14, 112:6-114:9 (Goodman).

65      *See id.* at 118:2-119:25 (Goodman).

66      *See id.* at 116:1-116:15 (Goodman).

67      *See id.* at 107:11-107:21 (Goodman).

of the denial of severance.[68]  The appeal directly challenged CA's allegations

concerning the ATM incident and pointedly protested CA's ongoing refusal to

provide Arnone with the security camera recording.[69]  On April 30, 2007,

Goodman replied directly to Arnone in a short letter indicating that he had

considered the appeal and that the claim was denied for the reasons set forth in the

February 27, 2007 letter.[70]  Goodman's review of the appeal consisted solely of

reading the letter from Arnone's counsel, asking a CA attorney whether new

evidence had come to light since the last appeal, and then signing a letter drafted

by counsel.[71]

## III.   LEGAL STANDARD

### A.   Delegation by a Plan Administrator

The duties of the plan administrator are primarily established by the

plan documents.[72]  Under the common law of trusts, which serves as a foundation

---

[68]     *See* 3/6/07 Letter from Stone to Goodman, Ex. 14.

[69]     *See id.*

[70]     *See* 4/30/07 Letter from Goodman to Arnone, Ex. 15.

[71]     *See* Tr. at 121:16-122:16 (Goodman).

[72]     *See, e.g., Daniel v. UnumProvident Corp.*, 261 Fed. Appx. 316, 319
(2d Cir. 2008).

15

to ERISA.[73] "A trustee has a duty to perform the responsibilities of the trusteeship

personally, except as a prudent person of comparable skill might delegate those

responsibilities to others."[74] "[T]he degree to which a trustee may rely on the

agent to make decisions and take action without personal investigation . . .

depends on what is reasonable and appropriate under the circumstances . . . ."[75]

On the other hand, "[i]n accepting the delegation of a trust function from a trustee,

an agent assumes a fiduciary role with fiduciary responsibilities. Thus, the agent

has a duty to the trust and its beneficiaries to act with reasonable care in

performing a delegated function . . . ."[76]

### B.    Full and Fair Review

The procedures for review by a plan administrator are established by

the plan documents.  However, ERISA requires that such procedures provide "full

---

[73]     *See McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126, 130 (2d Cir.
2008).

[74]     *Restatement (Third) of Trusts* § 80(1) (2007).

[75]     *Id.* § 80 cmt. g.

[76]     *Id.* (internal citations omitted).  *Accord Lowen v. Tower Asset Mgmt.,
Inc.*, 829 F.2d 1209, 1219 (2d Cir. 1987) (applying fiduciary duties to the delegate
of an administrator in an ERISA matter).  *See generally Restatement (Third) of
Trusts* §§ 76-79 (establishing Duty to Administer, Duty of Prudence, Duty of
Loyalty, and Duty of Impartiality).

and fair review" of a benefits determination.[77]  DoL regulations flesh out this

standard and provide minimum procedures necessary for full and fair review.[78]  In

particular,

> the claims procedures of a plan will not be deemed to
> provide a claimant with a reasonable opportunity for a full
> and fair review of a claim and adverse benefit
> determination unless the claims procedures . . . [p]rovide
> that a claimant shall be provided, upon request and free of
> charge, reasonable access to, and copies of, all documents,
> records, and other information relevant to the claimant's
> claim for benefits.[79]

The statutory and regulatory scheme (as authoritatively construed by an agency

charged with promulgating regulations pursuant to ERISA) takes precedence over

the terms of a qualifying benefits plan.[80]

The typical remedy for failure to provide a claimant with full

---

[77]  29 U.S.C. § 1133.

[78]  *See* 29 C.F.R. § 2560.503-1(h)(2).

[79]  *Id.* § 2560.503-1(h)(2)(iii). *See also id.* § 2560.503-1(m)(8) (defining what documents are "relied upon" in rendering a benefits determination). *See generally Massachusetts v. Morash*, 490 U.S. 107, 116 (1989) (affording *Chevron* deference to DoL regulations interpreting ERISA). A similar duty exists under the common law of trusts. *See Restatement (Third) of Trusts* § 82(2).

[80]  *See Esden v. Bank of Boston*, 229 F.3d 154, 159 (2d Cir. 2000).

17

procedural rights "is remand for further administrative review."[81]  Where

disclosures are completed, albeit in a tardy fashion, administrative remand is

foreclosed as futile.[82]  A benefits determination made without proper disclosures is

not subject to heightened scrutiny upon judicial review.[83]

### C.    Judicial Review

Under 29 U.S.C. § 1132(a)(1)(B), a plan participant or beneficiary

may bring a civil action "to recover benefits due to him under the terms of his

plan."  The Second Circuit recently clarified the standard of review to be utilized

in such cases.

> According to principles of trust law, a benefit
> determination is a fiduciary act, and courts must review *de
> novo* a denial of plan benefits unless the plan provides to
> the contrary.    However, where the plan grants the
> administrator discretionary authority to determine
> eligibility benefits, a deferential standard of review is
> appropriate. Under the deferential standard, a court may
> not overturn the administrator's denial of benefits unless its
> actions are found to be arbitrary and capricious, meaning

---

[81]    *Krauss v. Oxford Health Plans, Inc.*, 517 F.3d 614, 630 (2d Cir.
2008) (citations omitted).

[82]    *See id.* (citing *Miller v. United Welfare Fund*, 72 F.3d 1066, 1071 (2d
Cir. 1995)).

[83]    *See id.* (finding that the benefits determination at issue was merely
"*an* appropriate implementation" of the plan rather than *the* appropriate
implementation, indicating deferential review).

> without reason, unsupported by substantial evidence or erroneous as a matter of law.  Where both the plan administrator and a spurned claimant offer rational, though conflicting, interpretations of plan provisions, the administrator's interpretation must be allowed to control. Nevertheless, where the administrator imposes a standard not required by the plan's provisions, or interprets the plan in a manner inconsistent with its plain words, its actions may well be found to be arbitrary and capricious.[84]

"Substantial evidence means 'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"[85]

This deferential standard remains largely unchanged even when a plan administrator faces a conflict of interest.  Under the Supreme Court's recent decision in *Metropolitan Life Insurance Co. v. Glenn*, "a plan under which an administrator both evaluates and pays benefits claims creates the kind of conflict of interest that courts must take into account and weigh as a factor in determining

---

[84]    *McCauley*, 551 F.3d at 132-33.  *Cf. Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 190 (2d Cir. 2008) ("A district court abuses its discretion when '(1) its decision rests on an error of law (such as application of the wrong legal principle) or a clearly erroneous factual finding, or (2) its decision – though not necessarily the product of a legal error or a clearly erroneous factual finding – cannot be located within the range of permissible decisions.'") (quoting *Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 169 (2d Cir. 2001)).

[85]    *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (quoting *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004)).

whether there was an abuse of discretion."[86]  Consideration of the conflict is given

greater or lesser consideration depending on whether the "'the administrator has

taken active steps to reduce potential bias and to promote accuracy.'"[87] Such a

conflict of interest does not necessitate *de novo* review, "even where the plaintiff

shows that the conflict of interest affected the choice of a reasonable

interpretation."[88]

  *De novo* review is available only in two circumstances.  *First*, a Court

need not defer to a decision based on operation of law, rather than an individual

determination by a plan administrator.[89] *Second*, if the challenged benefit

determination is made by an unauthorized party, rather than the authorized

fiduciary, a court may engage in *de novo* review.[90]

### D. Interference with Protected Rights

  Section 1140 of title 29 of the United States Code forbids "any person

---

  [86] *Id.* at 133 (citing *Metropolitan Life Ins. Co. v. Glenn*, 128 S. Ct. 2343, 2348 (2008)).

  [87] *Id.* (quoting *Glenn*, 128 S. Ct. at 2348).

  [88] *Id.* (citing *Glenn*, 128 S. Ct. at 2348).

  [89] *See Nichols v. Prudential Ins. Co. of Am.*, 406 F.3d 98, 109 (2d Cir. 2005).

  [90] *See Sharkey v. Ultramar Energy Ltd.*, 70 F.3d 226, 229 (2d Cir. 1995).

to discharge, fine, suspend, expel, discipline, or discriminate against a participant

or beneficiary . . . for the purpose of interfering with the attainment of any right to

which such participant may become entitled under" a qualifying benefits plan. "An

essential element of plaintiff's proof under the statute is to show that an employer

was at least in part motivated by the specific intent to engage in activity prohibited

by § [1140]."[91]  Thus "'[n]o ERISA cause of action lies where the loss of pension

benefits was a mere consequence of, but not a motivating factor behind, a

termination of employment.'"[92]

### E.  Failure to Provide Requested Documents

Section 1132(c)(1)(B) of title 29 of the United States Code mandates,

> Any administrator . . . who fails or refuses to comply with
> a request for any information [that] such administrator is
> required . . . to furnish to a participant or beneficiary . . .
> may[,] in the court's discretion[,] be personally liable to
> such participant or beneficiary in the amount of up to $100
> a day from the date of such failure or refusal . . . .

Although the amount of an award is left to the discretion of the district court, the

Second Circuit has established five factors that a court should consider when

---

[91]     *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1111 (2d Cir. 1988)
(citing *Gavalik v. Continental Can Co.*, 812 F.2d 834, 851 (3d Cir. 1987), and
*Titsch v. Reliance Group, Inc.*, 548 F. Supp. 983, 985 (S.D.N.Y. 1982), *aff'd*, 742
F.2d 1441 (2d Cir. 1983)).

[92]     *Id.* (quoting *Titsch*, 548 F. Supp. at 985).

formulating a fee assessment: "'(1) the administrator's bad faith or intentional

conduct; (2) the length of the delay; (3) the number of requests made; (4) the

extent and importance of the documents withheld; and (5) the existence of any

prejudice to the participant or beneficiary.'"[93]

### F.   Attorney's Fees and Costs

In most private enforcement actions under section 1132, "by a

participant, beneficiary, or fiduciary, the court in its discretion may allow a

reasonable attorney's fee and costs of action to either party."[94]  The availability of

fees under ERISA is governed by a five-factor test.

> (1) the degree of the offending party's culpability or bad
> faith, (2) the ability of the offending party to satisfy an
> award of attorney's fees, (3) whether an award of fees
> would deter other persons from acting similarly under like
> circumstances, (4) the relative merits of the parties'
> positions, and (5) whether the action conferred a common
> benefit on a group of pension plan participants.[95]

---

[93]   *McDonald v. Pension Plan*, 320 F.3d 151, 163 (2d Cir. 2003)
(quoting *Austin v. Ford*, No. 95 Civ. 3730, 1998 WL 88744, at *6 (S.D.N.Y. Mar.
2, 1998)).

[94]   29 U.S.C. § 1132(g)(1).  In some actions brought by a fiduciary or on
behalf of a plan, attorney's fees are mandatory.  *See id.* § 1132(g)(2)(D).

[95]   *Chambless v. Masters, Mates & Pilots Pension Plan*, 815 F.2d 869,
871 (2d Cir. 1987) (citing *Ford v. New York Cent. Teamsters Pension Fund*, 506
F. Supp. 180, 183 (W.D.N.Y. 1980), *aff'd*, 642 F.2d 664 (2d Cir. 1981) (per
curiam)).  *Accord Krauss*, 517 F.3d at 63 (citing *Chambless* as continuing to

## IV.   CONCLUSIONS OF LAW

### A.   Denial of Benefits Claim

Arnone's principal claim is that Goodman and the CA Severance Plan wrongfully denied him severance benefits to which he is entitled.  Because the CA Severance Plan provides the plan administrator with broad latitude to interpret and implement its provisions, this Court cannot engage in *de novo* review.[96]  However, because Goodman serves two masters – the CA Severance Plan and CA, Inc. – a perfunctory review for arbitrary and capricious decision-making is also inappropriate.  In light of the Supreme Court's recent clarification of the proper standard in *Glenn*, this Court will carefully review Goodman's exercise of his discretion.[97]

Based on the absence of a prohibition concerning delegation of administration in the plan documents, the broad authority provided to the plan administrator to interpret the plan, and the common law inference that a trust such

provide the governing standard).

[96]    Neither of the two exceptions under which a court may engage in *de novo* review despite a grant of discretion to a plan administrator are present in this case.

[97]    This standard could aptly be labeled "abuse of discretion with dentition."  *Cf.* Gayle Lynn Pettinga, Note, *Rational Basis with Bite: Intermediate Scrutiny by Any Other Name*, 62 Ind. L.J. 779 (1987).

as the CA Severence Plan confers powers necessary to implement the trust, I find that Goodman did not violate ERISA by delegating to a subordinate the task of fact-finding or the responsibility to respond to requests for documents. However, as delegates of the plan administrator, Buonaiuto and the CA attorneys assumed fiduciary duties to the plan and to Arnone as a plan participant. Thus they held a duty of care and duty of loyalty to all plan participants to insure that the *correct* benefits determination was made, to serve as a judge rather than a prosecutor.

From the moment investigation began, Buonaiuto and CA attorneys acted as Arnone's adversaries, providing false information concerning the incident, setting traps to catch Arnone in inconsistent statements, and thwarting attempts to clear his name. By refusing to allow Arnone to see the complete surveillance video, refusing to turn over a copy of the video, refusing to tell him who had attempted and failed to use the ATM and making false statements concerning the person's gender, refusing to tell him how much money was purportedly taken, and failing to accept his offer to take a polygraph examination administered by an expert nominated by CA, Buonaiuto and CA's attorneys willfully blinded themselves to exculpatory evidence that Arnone could develop. In turn, Goodman's benefits decisions expressly hinged on the absence of new evidence brought to light since Buonaiuto's December 5, 2006 decision to

24

terminate Arnone for theft and dishonesty.  Given his delegates' consistent efforts to prevent Arnone from presenting new evidence, the denial of severance was inevitable.

Rather than taking "active steps to reduce potential bias and to promote accuracy,"[98] Goodman acted upon the biased determinations of his subordinates.  A decision based on a limited record that omits a panoply of neutral or contrary facts is arbitrary and capricious.[99]  Where the absence of evidence is a direct result of a fiduciary acting in violation of a duty of loyalty, by refusing to facilitate the collection and presentation of potentially exculpatory evidence, the abuse of discretion is even more egregious.  Thus Goodman abused his discretion when he denied Arnone's severance request and severance appeal.

Through the use of civil discovery, Arnone has now received the information he repeatedly requested from defendants.  Using this information, he has presented additional information in his defense.  Nevertheless, defendants maintain that Arnone is not entitled to severance.  Therefore, remand for further administrative review is foreclosed as futile.  This Court must determine whether

---

[98]      *McCauley*, 551 F.3d at 133.

[99]      *See Miller*, 72 F.3d at 1072.

the defendants' continued insistence that Arnone is not entitled to severance is arbitrary and capricious.

Upon review of the full evidence relating to the November 30, 2006 incident, the only rational conclusion is that Arnone was wrongfully denied severance. A simple distillation of the facts is warranted:

- Although Jason Medina attempted to withdraw $40 using the lobby ATM, no funds were disbursed and his account was not debited.

- Bethpage Credit Union records indicate that no funds were improperly disbursed on November 30, 2006.[100]

- Although the surveillance camera recorded Arnone touching the ATM, no cash is seen in his hand.

- Arnone provided testimony under oath explaining his interaction with the ATM, supported by substantial documentary evidence.

- No eyewitness testimony contradicts Arnone's story.

Although this Court recognizes the discretion vested in the Plan Administrator to place substantial reliance on Buonaiuto's conclusion that Arnone stole money

---

[100]     Although defendants' attorney asserted in his opening that money was missing from the ATM after the incident, see Tr. at 7:12-8:1 (Brickell), defendants failed to call any witnesses to support this statement. The statement of counsel, of course, is not evidence.

from the ATM based solely on the grainy and inconclusive video – in the face of a panoply of evidence to the contrary – the final determination was "unsupported by substantial evidence ."[101]   Simply put, defendants have never shown that there was a theft.  Therefore, Arnone could not be terminated for theft.  Absent cause for termination, Arnone is entitled to the value of his severance.

Judgment on the claim for improper denial of plan benefits under 29 U.S.C. § 1132(a)(1)(B) is granted in favor of plaintiff, Michael Arnone, in the amount of $38,352.96[102] plus $8,340.38 in interest,[103] against Andrew Goodman and the CA Severance Plan.

## B.        Interference Claim

Arnone's second claim alleges that CA, Inc., the CA Severance Plan, or Goodman terminated him for cause for the express purpose of interfering with

---

[101]     *McCauley*, 551 F.3d at 132.

[102]     This is simply the sum of the $33,852.96 Separation Payment and the $4,500 COBRA Assistance payment.  Although Arnone also requested reimbursement of his first COBRA payment – necessitated by the immediate cessation of his health benefits as a result of his termination for cause, *see* Tr. at 23:3-23:9 (Arnone) – continuity of health coverage after termination is not addressed by the CA Severance Plan.  Therefore this additional sum is not recoverable under ERISA.  *See* 29 U.S.C. § 1132(a)(1)(B) (limiting recovery to "benefits due to him under the terms of his plan").

[103]     This sum equals 9% interest on $38,352.96, from December 5, 2006 to February 13, 2009, compounded monthly.

his severance rights.  Arnone has not proven this claim.  There is no evidence that

staffing reductions were contemplated in Arnone's department at the time of his

termination.  If defendants were not planning to lay off Arnone at some later date,

they cannot have terminated him for cause in order to avoid paying severance.

Therefore, judgment is rendered in favor of defendants on Arnone's claim under

29 U.S.C. § 1140.

### C.    Failure to Produce Documents

Arnone's final claim demands a statutory penalty against Goodman,

as plan administrator, as a result of his delegates' refusal to provide documents

relied upon in rendering a benefits determination.[104]  Although the CA Severance

Plan does not expressly require the administrator to furnish any information

beyond plan documents, the administrator is required by statute to conduct a "full

and fair review."[105]  Because "full and fair review" requires access to documents

---

[104]    *See* 29 U.S.C. § 1132(c)(1).  The Prayer for Relief in Arnone's
complaint named only three ERISA provisions: 29 U.S.C. §§ 1132(a)(1)(B),
1109(a), and 1140.  *See* Joint Pretrial Order at 2.  However § 1132(a)(1)(B) is a
general vehicle for individual enforcement of ERISA rights, *see Gerosa v. Savasta
& Co., Inc.*, 329 F.3d 317, 325 (2d Cir. 2003), and Arnone has prayed that this
Court provide "other and further relief as the Court deems proper."  Joint Pretrial
Order at 2.  Moreover, Arnone noted possible liability for failing to provide
documents in the Joint Pre-Trial Order, *see id.* at 10, and defendants raised no
objections.  Thus any objection to this claim has been waived.

[105]    29 U.S.C. § 1133.

relied upon by the plan administrator, such documents fall within the statutory definition of "information which such administrator is required . . . to furnish to a participant or beneficiary."[106]

Goodman had a statutory duty to respond to Arnone's request for documents relied upon in rendering benefits determinations. Despite repeated requests, Goodman and his delegates refused to provide Buonaiuto with a panoply of evidence, including the name of the individual who had failed to receive funds from the ATM and a copy of the surveillance tape. Buonaiuto relied on the Global Safety Asset Protection Group's incident report – which contained the name of the individual who had attempted and failed to use the ATM – and the complete surveillance video in rendering his decision to terminate Arnone for cause. Goodman in turn relied on Buonaiuto's representations when denying Arnone's severance request and appeal. Although Goodman delegated decisions concerning disclosures to Buonaiuto and CA's attorneys, he bears ultimate responsibility for their failures.

An ERISA beneficiary should not be required to instigate litigation in order to receive information necessary to investigate and prove his claim for severance. Nevertheless, Arnone did not receive the requested information until

---

[106]     *Id.* § 1132(c)(1).

the commencement of discovery in this case. Application of the Second Circuit's

five-factor test justifies a substantial penalty. Although this Court has the

discretion to award up to $100 for each day that passed between Arnone's request

for documents and his receipt thereof – a period of over a year – I find that a

penalty of $10,000 is sufficient to deter similar misconduct in the future. This

penalty is assessed against Goodman in his capacity as administrator.

### D.    Attorney's Fees

The final issue for resolution is whether Arnone is entitled to

attorney's fees and costs. Four of the five factors in the Second Circuit's test

weigh in favor of an award of fees and costs. *First*, Goodman and his delegates

are responsible for this unnecessary litigation. By providing Arnone with false

information, refusing to turn over information relevant to the benefits

determination, and informing Arnone that his termination for cause would not

change even if Arnone worked to prove his innocence, defendants showed

remarkable bad faith and disregarded their fiduciary duties. *Second*, CA, Inc., a

company with over 13,000 employees is capable of paying Arnone's attorney's

fees. *Third*, an award of fees would serve as a general deterrent against conflicted

administrators and their delegates acting as prosecutors rather than neutral

arbiters. *Fourth*, as outlined above, defendants' position is clearly far less

30

meritorious than Arnone's.  The sole factor counseling against an award of fees and costs is the absence of a common benefit conferred upon a group of plan participants.  Therefore, I award Arnone the fees and costs of this action.

## V.    CONCLUSION

For the foregoing reasons, judgment is rendered in favor of plaintiff, Michael Arnone, in the amount of $46,693.34 against Goodman and the CA Severance Plan and in the amount of $10,000 against Goodman individually. Arnone is ordered to submit records supporting his claim for attorney's fees and costs by February 20, 2009.  Defendants may submit any objections by February 27, 2009.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            February 13, 2009

- Appearances -

**For Plaintiff:**

Nathaniel B. Smith, Esq.
Law Office of Nathaniel B. Smith
111 Broadway, Suite 1305
New York , New York 10006
(212) 227-7062

**For Defendants:**

Jamie Mark Brickell, Esq.
Anna E. Hutchinson, Esq.
Pryor Cashman LLP
410 Park Avenue
New York , New York 10022
(212) 326-0869